# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE
_____

## NO. 06-621
_____

### CHRISTOPHER P. PATAKI

**Plaintiff**

v.

### PRUDENTIAL FINANCIAL, INC. AND THE PRUDENTIAL
### INSURANCE COMPANY OF AMERICA

**Defendant**

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

**Megan Harper, Esquire**
**Attorney I.D. No. 4103**
**WILSON,ELSER, MOSKOWITZ,**
**EDELMAN & DICKER LLP**
**Suite 1130 East – Curtis Center**
**Independence Square West**
**Philadelphia, PA 19106**
**(215) 627-6900**
**Attorney for Defendants**
**Prudential Financial, Inc. and The Prudential**
**Insurance Company of America**

Filed:  August 13, 2007

## <u>TABLE OF CONTENTS</u>

STATEMENT OF THE CASE……... …………………………………    4

SUMMARY OF THE ARGUMENT………………………………….    5

STATEMENT OF THE FACTS…………………………………….    6

STANDARD OF REVIEW…………………………………………..    14

ARGUMENT……………………………………………….………..    17

     A.   <u>Prudential is Entitled to Summary Judgment as the Administrative Record Fails to Establish that Plaintiff is Functionally Incapable of Full Time Employment at a Sedentary Occupation</u>. …………………………………    17

CONCLUSION/RELIEF REQUESTED…………………………....    22

261609.1

# TABLE OF CITATIONS

## CASES

Abnathya v. Hoffmann-LaRoche, Inc., 2 F.3d 40 (3d Cir. 1993)………...    15

Acevedo v. Start Plastics, Inc., 834 F.Supp. 808 (E.D. Pa. 1993)………..    14

Adamo v. Anchor Hocking Corp., 720 F.Supp. 491 (W.D. Pa. 1989)……    15

Aetna Health Inc. v. Davila, 125 S.Ct. 2488, 159 L.Ed.2d 312 (2004)…...    15

Black & Decker Disability Plan v. Nord, 538 U.S. 822, 123 S.Ct. 1965 (2003)    20

Cerneskie v. Mellon Bank Long Term Disability Plan, 2005 U.S. App. LEXIS
    11868 (2005)………………………………………………………    20

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948,
    103 L.Ed. 2d 80 (1989) …………………………………………    11

Ford v. Unum Life Ins. Co., 465 F.Supp.2d 324 (D.Del. 2006)…………...    16

Jones v. School Dist. of Phila., 198 F.3d 403 (3d Cir. 1999) ……………..    14

McLeod v. Hartford Life and Accident Ins. Co., 372 F.3d 618, 623
    (3d Cir. 2004)………………………………………………….    16

Orvosh v. Program of Group Ins. for Salaried Employees of Volkwagen
    of America, Inc., 222 F.3d 123, 129 (3d Cir. 2000)………………..    15, 21

Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000)…......    16, 21

Schlegel v. Life Ins. Co. of N. Am., 269 F.Supp.2d 612 (E.D. Pa. 2003)….    14, 20

Skretredt v. E.I. DuPont de Nemours and Co., 268 F.3d 167 (3d Cir. 2001)    20

Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc., 298 F.3d 191
    (3d Cir. 2002) …………………………………………………    15

Stratton v. E.I. DuPont de Nemours & Co., 363 F.3d 250 (3d Cir. 2004)...    15, 20, 21

Sweeney v. Standard Ins. Co., 276 F.Supp.2d 388 (E.D. Pa. 2003)………..    20

## STATUTES

Employee Retirement Income Security Act of 1974 (ERISA)
    29 U.S.C. §1001, *et seq*...………………………………………    4

## STATEMENT OF THE CASE

On or about January 25, 2006, Defendants Prudential Financial, Inc. and The Prudential Insurance Company of America (hereinafter referred together as "Prudential") terminated plaintiff, Christopher P. Pataki's ("Pataki") long term disability ("LTD") benefits.  Plaintiff administratively appealed the termination of his benefits to Prudential via letter dated February 1, 2006.  After carefully considering plaintiff's appeal and supporting documents, Prudential upheld its initial decision to terminate plaintiff's LTD benefits.  Plaintiff then had the option to administratively appeal this decision to Prudential for a second time or file a legal action. Plaintiff filed suit in this court on October 4, 2006.  This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, *et seq.*

## <u>SUMMARY OF THE ARGUMENT</u>

1.      Did defendant act arbitrarily or capriciously when it terminated plaintiff's LTD

benefits where the administrative record failed to substantiate any functional impairment for

plaintiff's sedentary occupation?

*Suggested Answer:  No.*

## STATEMENT OF THE FACTS

Plaintiff Pataki is a 45 year old man who was employed as a Secured Research Lending Analyst at MBNA Corporation when he stopped working on July 9, 2002 due to a diagnosis of dermatomyositis and pulmonary emobolus.  (See, PRU 116, 124, 826, 829 of the Record)  As a result of his illness, Pataki filed a claim for LTD benefits under Group Contract G-24923 ("Policy") issued to his employer, MBNA Corporation.  (See, Pru  834-880 of the Record.)  This disability Policy is an employer-sponsored benefit program and, as such, is subject to the terms of ERISA.

Under the Policy, Prudential is provided discretionary authority to interpret the terms and conditions of the Policy, including when "disability" exists.  Upon the onset of alleged disability, the Policy requires that a claimant be unable to perform the material and substantial duties of his regular occupation due to his sickness or injury.  After 36 months of payments, a claimant must be unable to perform not only the duties of his or her own occupation, but of the duties of any gainful occupation for which he or she is reasonably fitted by education, training or experience in order to continue receiving benefits.  (See, PRU 843 of the Record)

Pataki's occupation as a Secured Research Lending Analyst is a sedentary position which requires him to exert force to lift/carry, push/pull objects to 10 pounds occasionally or up to negligible weight frequently.  It also may require the need to walk and or stand occasionally throughout the work day and have frequent use of upper extremities for reaching, handling, or fingering items.  (See, PRU 106, 829 of the Record)

Pataki was first diagnosed in September of 1999 with dermatomyositis.  (See, PRU 124, 829)  Shortly thereafter, plaintiff went out of work in February of 2000 when he had an aggravation of his condition of dermatomyositis and was unable to move his muscles.  He

returned to work and worked 4 hours per day for two to three months, then ten months at 6 hours a day and then returned to work full time. (See, PRU 56, 124 of the Record) Plaintiff continued to have his blood monitored to check for enzyme levels. In July of 2002 his rheumatologist advised him that his levels were very high. He stopped working at that time and underwent treatments for his illness. (See, PRU 56 of the Record) In August of 2002 Pataki suffered a deep vein thrombosis in his lung and was hospitalized. (See, PRU 56, 806 of the Record) However, by November of 2002, plaintiff was back to work part time four hours a day. (See, PRU 56, 125 of the Record) After the required elimination period of 180 days, plaintiff was eligible for long term disability benefits on January 5, 2003. (See, PRU 116, 834 of the Record)

Prudential reviewed the Attending Physician's Statement which was submitted along with plaintiff's LTD disability claim. Pataki's rheumatologist notes that he is out of work due to dermatomyositis (acute inflammation of the muscles characterized by fever, malaise and weakness) and pulmonary embolus. (See, PRU 56, 826-828 of the Record) The doctor states that the prognosis for Pataki's return to work is excellent and expects him to be able to return to full time duty in early 2003. (See, PRU 826-828 of the Record) After examining plaintiff's medical records, Prudential notes that Pataki has a chronic condition which needs to be medically managed and followed for improvement. (See, PRU 57 of the Record) On January 30, 2003, Prudential approved Pataki's claim for partial LTD benefits.

Prudential continued to monitor Pataki's condition and in July of 2003, plaintiff's doctor approved an increase of 30 minutes per work day. (See, PRU 131-132 of the Record) By September 30, 2003, Pataki's doctor had increased his work hours to six hours per day. (See, PRU 132, 726 of the Record) However, in December of 2003, Pataki's hours were reduced to four hours per day as he was allegedly suffering from myalgia or muscle pain and weakness in

both his arms and legs.  (See, PRU 719 of the Record)  Prudential continued plaintiff's partial LTD benefits noting that a consistent decrease in his medications would be needed prior to determining whether an increase of work hours was possible.  (See, PRU 78 of the Record)  On May 19, 2004, Prudential's clinical reviewer notes that the plaintiff's office visit notes reflect complaints of poor endurance although there was no reported problem with muscle pain or weakness.  There was no change in his medication dosage.  (See, PRU 82 of the Record)  On December 14, 2004, Prudential extends Pataki's partial LTD benefits noting that the office visit notes state that plaintiff was recently diagnosed with diabetes mellitus which is contributing to plaintiff's weakness.    The office visit notes also reflect that Pataki's condition of dermatomyositis remains controlled.  (See, PRU 91, 505-508 of the Record)

On May 2, 2005, an internal medical review by Prudential determined that Pataki's medical conditions seemed to have improved and a functional capacity review was suggested. (See, PRU 98-99, 361-363 of the Record)  A functional capacity evaluation by plaintiff's rheumatologist was completed, and indicated that with position change, Pataki could sit for four hours, stand for two hours, and walk for 1 hour during an eight hour work day.  (See, PRU 105, 441-443 of the Record)  After a discussion of Pataki's claim with the Medical Director, it was determined that because Pataki's enzyme levels were still elevated (his muscle enzyme levels are objective indicators of inflammation in the muscle), Prudential would continue to pay partial LTD benefits.  However, Prudential also decided to retain an investigator to document Pataki's functional level.  (See, PRU 107, 406-412, 421-424 of the Record)  The investigation, which consisted of video surveillance, live surveillance, and a background information check, revealed that Pataki was actively involved in the local YMCA gym.  According to the investigator's sources there, plaintiff was noted to attend the gym approximately twenty five times per month

and was a member of a soccer league.[1]  (See, PRU 421-424 of the Record)   More importantly, the investigators observed plaintiff for two days and on both days he visited the YMCA gym at approximately 8:45 a.m. for a little over an hour each day.  (See, PRU 406-412 of the Record) The first day, plaintiff was observed in a yoga class which lasted approximately an hour.  After leaving the gym, he does some errands and then goes back home and leaves soon after for work at the MBNA office building.  (Id.)  He worked from 1:00 p.m. to 5:00 p.m. and then picked up some pizza on the way home.  (Id.)  On the second day, investigators observed plaintiff returning to the YMCA and videotaped plaintiff on a step machine (elliptical machine) for about thirty minutes exercising at a brisk pace.  (Id.)  Thereafter, he was taped working on various pieces of exercise equipment for his upper body.  (Id.)  After his work out, plaintiff visits the grocery store and shops for about thirty minutes.  (Id.)  He returns home and he is not seen the rest of the day.[2]

In January of 2006, Prudential referred Pataki's file, including new medical records and surveillance reports for a review with its Medical Director, Albert Kowalski, M.D.  Dr. Kowalski reports that while there are laboratory results reflecting elevated muscle enzymes which would appear to indicate muscle inflammation, these enzyme readings do not correlate with the plaintiff's symptoms, physical findings, or his sedimentation rate.  (See, PRU 117-118 of the Record)  The medical records for 2005 reveal that plaintiff's dermatomyositis is well controlled with no reported muscle pain and a reduction in his medication.  There is also no indication that the plaintiff's other illnesses such as deep vein thrombophlebitis, pulmonary embolus, diabetes or depression resulted in significant impairment to the plaintiff in 2005.  (Id.)  Dr. Kowalski

---

[1]   In appealing the termination of his benefits, Pataki provided a letter from the YMCA indicating that he has two children participating in the Spring Youth Soccer Program but that Pataki himself does not play soccer and he also provided a YMCA facility access report which indicates that in the last twenty eight months, Pataki accessed the gym 284 times total.  (See, PRU 265-266 of the Record)  However, plaintiff admitted in the form entitled Activities of Daily Living that he exercises daily in order to maintain his health.  (See, PRU 465 of the Record)
[2]   Pataki states that he went to work that afternoon but the investigators missed it.  (See, PRU 263 of the Record).

concludes that the wide variations in enzyme readings results from plaintiff's strenuous exercise program.  (Id.)  Dr. Kowalski also opines that plaintiff is able to work a full day at his sedentary job even with his elevated enzyme readings because the subjective complaints, physical examination and laboratory findings do not support impairment from his dermatomyositis.  (Id.)  Dr. Kowalski states that the latest office visit note dated November 2005 reflects that Pataki has very little complaints of myalgia or arthralgia.  (See, PRU 117-118, 294-296 of the Record)  While Pataki does complain of lack of endurance and mid-afternoon fatigue, the surveillance video demonstrated that plaintiff is able to engage in a strenuous exercise regiment for over a 45 minute period.  This video strongly supports the claimant's ability to perform his sedentary occupation on a full time basis.  (Id.)

On January 25, 2006, Prudential terminated plaintiff's partial LTD benefits.  (See, PRU 15-18, 120 of the Record)  On February 1, 2006, plaintiff appealed Prudential's decision to terminate his benefits.  He indicated that his doctor would be forwarding medical documentation to support his appeal.  (See, PRU 273 of the Record)  On March 13, 2006, plaintiff followed up with another letter of appeal outlining the history of his dermatomyositis and explaining that he was once a healthy adult who was very active but is no longer able to be so because of his condition.  (See, PRU 268-272 of the Record)  Pataki outlines the various changes in his life and the medications that he has to take.  He explains that he exercises daily in order to manage his diabetes and that the aerobic exercise allowed him to discontinue his oral insulin medication.  (Id)  He disputes the January 25, 2006 termination of his benefits stating that his unconfirmed Raynaud's phenomenon impacts his ability to use the computer.  However, his own rheumatologist indicates that plaintiff has no restrictions of handling, grasping, fingering, and feeling in his functional capacity evaluation.  (See, PRU 441 of the Record)  Plaintiff also states

that Prudential misquotes the normal range of enzyme readings and that it should reflect 22 to 198 units/liter. (See, PRU 271 of the Record), yet the laboratory results which were provided to Prudential by his own doctor reflect that a range of 40 to 250 units/liter is a normal reading. (See, PRU 308 of the Record)

The only documentation received in support of his appeal (other than plaintiff's own explanations) is a short letter dated April 10, 2006 from Pataki's rheumatologist, Dr. Newman, and some documentation from YMCA. (See, PRU 264-266 of the Record) The letter from Dr. Newman merely states that plaintiff's illness has been generally well controlled in recent years with occasional flares, although there appears to be some continual low grade activity which is reflected by the mild elevation of the CPK enzymes. (See, PRU 264 of the Record) His somewhat tentative letter attributes plaintiff's subjective complaints of lack of endurance and chronic fatigue, which prevents a return to full time work, as possibly resulting from mild hypothyroidism. (Id.) He also states that the plaintiff's condition of inflammatory myopathy could *also* account for the fatigue within reasonable medical probability. (Id.) A reading of Dr. Newman's letter reveals no certain explanation for plaintiff's subjective complaints of lack of endurance and fatigue. His letter merely states that it is within the realm of medical possibility that the mild hypothyroidism and the condition of inflammatory myopathy could theoretically be causing plaintiff's reported fatigue.

Lastly, on May 15, 2006, plaintiff wrote again to Prudential disputing the medical opinions of Prudential's medical director Dr. Kowalski as opposed to his doctor who specializes in rheumatology. In addition, plaintiff Pataki attempted to dispute the surveillance results. (See, PRU 262-263 of the Record) Plaintiff's main source of defense appears to be that he needs to exercise in order to maintain his health. There is no dispute that he should exercise. The dispute

here is that he states that he is unable to work full time and yet is capable of the vigorous exercise reflected in the video surveillance.  (See, PRU 881 of the Record)

On June 23, 2006, Prudential obtained a file review of plaintiff's case from a board certified rheumatologist, Dr. Paul F. Howard.  (See, PRU 252-259 of the Record)  He reviewed plaintiff's entire file and concluded that throughout the year of 2005 plaintiff's dermatomyositis was well controlled causing no significant symptoms.  (Id.)  Dr. Howard quotes plaintiff's doctor as saying that plaintiff was "fairly asymptomatic from it."  (See, PRU 333 of the Record) Prednisone was also subsequently reduced which provides further proof that the plaintiff's disease was under good control and that the CPK enzyme elevation did not correlate to any clinical symptoms of muscular weakness, muscular pain, or resulting functional impairment.  Dr. Howard opines that had plaintiff's condition of dermatomyositis been more active, the steroids would clearly not have been reduced.  (Id.)  Dr. Howard can find no explanation for Pataki's complaints of fatigue in light of the well controlled dermatomyositis.  In fact, in light of the lack of functional impairment, no restrictions or limitations are indicated.  (Id.)  Dr. Howard finds that plaintiff's conditions of dermatomyositis, diabetes, and Raynaud phenomenon are well controlled with appropriate treatment.  (Id.)

On July 5, 2006, after reviewing plaintiff's submissions, the surveillance reports, video surveillance, and the file review by Dr. Howard, Prudential upheld its decision to terminate the plaintiff's partial LTD benefits.  (See, PRU 5, 122 of the Record)  Prudential determined that a review of plaintiff's laboratory studies showed the absence of anemia, normal white blood count and platelet count, normal liver function tests and protein studies.  In addition, his sedimentation rate readings were within normal range in May through October of 2005.  The file review indicated no supportive medical findings that Raynaud was causing a functional impairment.  In

addition, with regards to dermatomyositis, plaintiff never had any significant evidence of increased activity with the exception of a transient increase in steroids due to arm pain in August of 2005.   Lastly, plaintiff's own doctor noted that the dermatomyositis was well controlled causing no significant symptoms.   Prudential found that the control of plaintiff's disease is supported by the medical records with the absence of any muscle weakness or pain which has corresponded with the steady reduction of plaintiff's steroid intake.   (Id.)

## STANDARD OF REVIEW

### A.     Summary Judgment Standard

In deciding upon cross motions for summary judgment, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the *Rule 56* standard."  Schlegel v. Life Ins. Co. of N. America, 269 F.Supp. 2d 612, 615, n.1, citing, 10A Charles A. Wright, Arthur R. Miller & Mary Kane, Federal Practice and procedure §2720 (1998).

Thus, with respect to each party, summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions and affidavits show there is no genuine issue of material fact such that the moving party is entitled to a judgment as a matter of law.  Jones v. School District of Phila., 198 F.3d 403, 409 (3rd Cir. 1999).  This rule is a procedural device, which enables the court to facilitate the resolution of a matter without the expense and delay of conducting a trial when the critical facts of the case are not in dispute.  Acevedo v. Start Plastics, Inc., 834 F. Supp. 808 (E.D. Pa. 1993) (emphasis added).

### B.     ERISA Standard of Review

The Policy at issue contains a specific definition of disability:

"You are disabled when Prudential *determines* that:

● 	you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and

● 	you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.

> After 36 months of payments, you are disabled when Prudential determines that due to
>
> the same sickness or injury, you are unable to perform the duties of any ***gainful***
>
> ***occupation*** for which you are reasonably fitted by education, training or experience.

(See, PRU 843 of the Record, [emphasis added])   The language quoted above plainly grants Prudential discretion to determine a participant's entitlement to LTD benefits.

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L.Ed. 2d 80, 109 S.Ct. 948 (1989) the United States Supreme Court held that if the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits, or to construe the terms of the policy, then the denial of benefits, challenged under ERISA § 1132(a)(1)(B), is not to be reviewed *de novo*.   *De novo* review only applies absent discretionary language.   Id. at 115, see also, Aetna Health Inc. v. Davila, 124 S.Ct. 2488; 159 L.Ed. 2d 312 (June 21, 2004). Consequently, the standard of review is not whether a different conclusion could have been reached, but whether Prudential's determination was arbitrary and capricious, without reason, unsupported by substantial evidence and/or erroneous as a matter law.   Abnathya v. Hoffmann-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993), quoting, Adamo v. Anchor Hocking Corp., 720 F.Supp. 491, 500 (W.D. Pa. 1989).   Thus, an administrator's decision will only be overturned if "it is 'clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan.'"   Orvosh v. Program of Group Ins. For Salaried Employees of Volkswagon of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000), quoting, Abnathya, 2 F.3d at 41.   It is well settled that a court may not substitute its own judgment for that of a plan administrator under either the deferential or heightened arbitrary and capricious standard.   Stratton v. E.I. DuPont de Nemours & Co., 363 F.3d 250, 256 (3d Cir. 2004), citing, Smathers v. Multi-Tool, Inc. / Multi-Plastics, Inc., 298 F.3d 191, 199 (3d Cir. 2002).

Because Prudential both funds and administers benefits, the proper standard of review is a sliding scale of heightened scrutiny of the arbitrary and capricious standard as set forth in McLeod v. Hartford Life and Accident Ins. Co., 372 F.3d 618, 623 (3d Cir. 2004). See also, Pinto v. Reliance Standard Life Ins., 214 F.3d 377, 390 (3rd Cir. 2000). The heightened scrutiny is a "sliding scale" that will allow each case to be examined on its own facts. Id. This "sliding scale" intensifies the degree of scrutiny to match the degree of conflict. Thus the less evidence there is of conflict on the part of the administrator, the more deferential the standard becomes. Id. at 392. In weighing the severity of a conflict, the Pinto court offered a list of factors to consider: (1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, because the deterioration of the company may affect the company's desire to maintain employee satisfaction. Ford v. Unum Life Insurance Co., 465 F.Supp.2d 324, 332 (D.Del. 2006), citing, Pinto v. Reliance, 214 F.3d at 392. Other factors to consider in applying a heightened standard of review are procedural irregularities, bias or unfairness in the review process. These include: "(1) reversal of a claim determination in the absence of new medical information; (2) the use of self-serving and selective use of medical evidence; and (3) indications that the administrator's decision conflicts with its own employee's internal recommendation." Id. [citations omitted.]

**ARGUMENT**

**A**.   **Prudential is Entitled to Summary Judgment as the Administrative Record Fails to Establish that Plaintiff is Functionally Incapable of Full Time Employment at a Sedentary Occupation.**

In the instant case, other than perhaps the sophistication of the parties involved, there is no evidence to heighten the review to any significant degree. There is no evidence of a reversal of a claim determination in the absence of new medical information, no use of self-serving or selective use of medical evidence, and no indications that the administrator's decision conflicts with its own employee's internal recommendations. Prudential continued partial LTD benefits to plaintiff for three years until there was clear evidence that he was capable of a return to full time work. The definitive opinions of both the file review rheumatologist and the internal medical director as well as video surveillance which show plaintiff's capabilities are substantial evidence that plaintiff is capable of returning to work full time.

Prudential granted partial LTD benefits to Pataki for a period of three years finding that he was disabled from working full time in his sedentary occupation due to a flare up of his chronic condition of dermatomyositis. This condition involves acute inflammation of the muscles characterized by fever, malaise and weakness and was monitored using laboratory tests to determine the levels of enzyme[3] in his blood as well as complaints of myalgia and muscle pain and weakness. Pataki had been granted disability for this same condition in 2000 but he returned to full time work gradually after a period of one year. Then one year later, he had another flare up leading to the current claim for disability. In the current period of disability, other than a short period of six hour days, plaintiff has continually maintained a four hour part time work

---

[3]   During a flare up of this condition, the enzyme levels would reach to 12,000. At all relevant times during 2005, plaintiff's CPK levels remained between 270-853. (See, PRU 000255 of the Record)

schedule.  Prudential continued to monitor plaintiff's condition by requesting laboratory results and the office visit notes of Pataki's rheumatologist, Dr. James Newman.

Beginning in late 2005, it appeared that plaintiff's condition of dermatomyositis was being managed and controlled.  In August of 2005, Dr. Newman indicated that the dermatomyositis was "reasonably well contained on his current medications and he is fairly asymptomatic from it."  (See, PRU 000333 of the Record)  In November of 2005, Dr. Newman comments that "[h]is strength is good and he really has very little complaint of myalgia or arthralgia.  His biggest complaint continues to be lack of endurance and midafternoon fatigue but is dealing with this fairly well."  (See, PRU 000294 of the Record)  Dr. Newman further notes on the same day (referring to plaintiff's condition of dermatomyositis) that "he is doing well symptomatically, functionally and objectively at the present time.  We will reduce prednisone to 10 mg and I think we can probably do a CPK once monthly [instead of bi-monthly] and every three months we can do other laboratory studies."  (See, PRU 000295 of the Record)  Dr. Newman also indicated that with position change, plaintiff could sit for four hours, stand for two hours and walk for one hour during an eight hour work day.  (See, PRU000441-443 of the Record)  Still, Prudential's medical director, Dr. Kowalski cautiously recommended continuation of benefits as plaintiff's CPK enzyme levels (indicators of inflammation in the muscle) were elevated.  (See, PRU000107 of the Record)  Prudential decided to do an activities check to further document plaintiff's level of function.  (Id.)

On November 15 and 16 of 2005, plaintiff was placed under surveillance.  The surveillance report indicates that plaintiff works out daily at the local YMCA and that he is a member of the soccer league.  (See, PRU000406-412 and PRU000421-424 of the Record) Plaintiff does not deny that he exercises daily but denies that he played soccer.  He states that he

was present at the soccer fields only to watch his children play.  (See, PRU 000271 of the Record)  The surveillance report indicated that of the two days that plaintiff was followed, the first day he took a yoga class for one hour and then did some errands and went to work at his job. On the second day, plaintiff visited the gym again at the same time as the day before and began to do a thirty minute session on the step/elliptical machine at a brisk pace.  Then he worked out his upper body on various machines.  After he left the gym, he went grocery shopping. According to the plaintiff, it appears that the surveillance team then missed the fact that he went to work in the afternoon.

After viewing plaintiff's activities and level of function, Dr. Kowalski had an explanation for the variations on the levels of CPK (enzymes) in his laboratory results.  He concluded that the claimant's exercise program could be responsible for the elevation and that the variations in the CPK enzymes were not a good indicator for the severity of the plaintiff's dermatomyositis.  Dr. Kowalski found that plaintiff's condition of dermatomyositis was well controlled in 2005 and that the surveillance video supports plaintiff's ability to perform a sedentary occupation on a full time basis.  (See, PRU000118 of the Record)  In reviewing the surveillance video, it is quite clear that he has no impairments from performing the sedentary duties of his occupation or any other occupation.  (See, PRU000881 of the Record)  Plaintiff indicates that the exercise regimen is needed for the maintenance of his diabetes.  While Prudential does not dispute that an exercise regiment is important and helpful, this does not translate into a responsibility on the part of Prudential to pay for his exercise regimen instead of requiring that he return to full time work as he is capable of doing and work out on his own time.

Plaintiff then objected to the fact that Prudential relied upon the opinions of its medical director, who was not a rheumatologist.[4]  While not obligated to do so, Prudential obtained a file review from a rheumatologist, Dr. Paul Howard, of plaintiff's complete medical record.  (See, PRU000252-259 of the Record)  Dr. Howard states that in December of 2003 plaintiff had active symptoms of dermatomyositis which required significant anti-inflammatory and immunosuppressive medication, resulting in significant fatigability.  There is also mention in plaintiff's records of significant myalgia, muscle pain, and weakness in both arms at that time.  (See, PRU000254 of the Record)  Dr. Howard then notes that on October 21, 2004 plaintiff was taken off of an immunomodulating agent and that over the course of the year his steroids were steadily lowered to a level of 10 mg a day on November 21, 2005.  Also through 2005, plaintiff denies weakness, myalgias, or arthralgias.  (Id.)  Dr. Howard concludes that based on the available medical documentation, Pataki has dermatomyositis and diabetes.  There is no indication that the condition of Raynaud's is causing any functional impairment.  (See, PRU000256 of the Record)  As to the condition of dermatomyositis, due to the fact that the

---

[4]   It is important to note that the United States Supreme Court in Black & Decker Disability Plan v. Kenneth L. Nord, 538 U.S. 822; 123 S. Ct. 1965 (2003), specifically and expressly held that disability claims (Plan) administrators are not obliged to accord special deference to the opinions of treating physicians in ERISA matters, stating that "plan administrators...may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.  But...courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; *nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.*" Id. at 833-834 [emphasis added].  The Third Circuit adopted the Supreme Court's reasoning in Stratton v. Dupont De Nemours & Co., 363 F. 3d 250 (3rd Cir. 2004) and again more recently in Cerneskie v. Mellon Bank Long Term Disability Plan, 2005 U.S. App. LEXIS 11868 (June 21, 2005), recognizing that its opinion in Skretvedt v. E.I. DuPont de Nemours and Co., 268 F.3d 167, 184 (3d Cir. 2001) [4] conflicts with the Supreme Court's holding in Black & Decker.  That plaintiff's treating physicians had concluded that she was unable to perform any occupation would not be entitled to "special weight" under the law as it has existed at least since Black & Decker.  This is because courts have found that the opinions of a treating physician may also exhibit bias and conflict of interest. Stratton, 363 F.3d at 258.  See also, Sweeney v. Standard Ins. Co., 276 F. Supp. 2d 388, 396 (E.D. Pa. 2003) (reliance on the review of non-treating physicians is not a procedural anomaly that demands a heightened level of scrutiny); Schlegel v. Life Ins. Co. of N. Am., 269 F.Supp.2d 612, 627 (E.D. Pa. 2003) (the plan administrators' reliance on its own non-treating physician over the opinions of the insured's treating physicians did not render its decision to deny benefits arbitrary and capricious because in relying on its own non-treating physicians, the plan administrator violated no policy provision, nor did it render a decision that was arbitrary and capricious on this basis).

steroid levels were steadily lowered throughout 2005 to 10 mg. per day, and plaintiff's attending rheumatologist indicated that the dermatomyositis as well controlled and plaintiff was "asymptomatic," Dr. Howard found no medical support for any degree of functional impairment. He adds that the varying levels of CPK enzyme did not correlate with his clinical symptoms. (Id.)  In addition, there is no medical information to support that plaintiff's diabetes had resulted in any degree of functional impairment as of February 1, 2006.  (Id.)  Lastly, Dr. Howard notes that the plaintiff's complaint of fatigue cannot be explained by the well controlled dermatomyositis.  (See, PRU000257 of the Record)

Prudential's decision process reveals no procedural bias or irregularities.  Prudential granted benefits to plaintiff for three years on the advice of only the plaintiff's physician.  When Prudential obtained surveillance to monitor plaintiff's functional capabilities, it was evident that plaintiff was not disabled from full time employment.  An independent file review also revealed no objective findings which would prevent the plaintiff from working in his occupation as well as any other sedentary occupation.

As there is no evidence of the type of procedural bias which raises the level of scrutiny to the higher end of the sliding scale as outlined in Pinto, Prudential's decision should be reviewed under the lowest level of heightened scrutiny.  Pinto, 214 F.3d at 393-394.  Consequently, Prudential's decision should only be overturned if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.  Stratton, 363 F.3d at 256, quoting, Orvosh, 222 F.3d at 129.  The termination of benefits due to the finding that plaintiff was determined to be able to perform sedentary work was not arbitrary or capricious.  There is substantial evidence in the record to indicate that plaintiff is capable of full time sedentary work and Prudential's decision to terminate benefits was not arbitrary or capricious under any standard of review.

## <u>CONCLUSION</u>

As appears above, plaintiff cannot show that the decision to terminate his disability benefits was arbitrary, capricious or otherwise improper.  Defendants, Prudential Financial, Inc. and The Prudential Insurance Company of America therefore respectfully request that summary judgment be entered in their favor, and that this action be dismissed with prejudice.

Respectfully submitted by,

BY:              s/ Megan Harper/
              Megan Harper, Esquire
              Attorney I.D. No. 4103
              WILSON,ELSER, MOSKOWITZ,
              EDELMAN & DICKER LLP
              Suite 1130 East – Curtis Center
              Independence Square West
              Philadelphia, PA 19106
              (215) 627-6900
              Attorney for Defendants
              Prudential Financial, Inc. and The Prudential
              Insurance Company of America