```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE

CHRISTOPHER P. PATAKI,         :
                               :
        Plaintiff,             :
                               :
    v.                         : Civil Action No. 06-621-JJF
                               :
PRUDENTIAL FINANCIAL, INC.     :
and THE PRUDENTIAL INSURANCE   :
COMPANY OF AMERICA             :
                               :
        Defendants.            :
```

Brian E. Lutness, Esquire of SILVERMAN, MCDONALD, & FRIEDMAN, Wilmington, DE.

Attorney for Plaintiff.

Megan Harper, Esquire of WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP of Philadelphia, PA.

Attorney for Defendants.

**MEMORANDUM OPINION**

April 23, 2008

Farnan, District Judge

Presently before the Court are Plaintiff's and Defendants' Cross Motions For Summary Judgment. (D.I. 13, D.I. 15.) For the reasons discussed, Defendants' Motion will be granted and Plaintiff's Motion will be denied.

## BACKGROUND

On October 4, 2006, Plaintiff Christopher P. Pataki ("Mr. Pataki") filed this action pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, *et seq.*, against Prudential Financial, Inc. and The Prudential Insurance Company of America (collectively, "Prudential"). Mr. Pataki contends that Prudential's termination of his long-term disability benefits ("disability benefits") on or about January 25, 2006 was arbitrary and capricious and unsupported by substantial evidence. Mr. Pataki seeks the restoration of his disability benefits and group life insurance benefits, payment of all benefits that have accrued between benefit termination and judgment, and attorney's fees and costs of the action.

Mr. Pataki is a 45 year-old man employed as a secured research lending analyst at MBNA Corporation. In September of 1999, he was diagnosed with dermatomyositis, an inflammatory disease that causes muscle pain, swelling, and fatigue. (D.I. 14.) Beginning in February 2000, Mr. Pataki stopped working because of an aggravation in the dermatomyositis. He was able to

1

return to work shortly thereafter by gradually increasing the hours of his workday. (D.I. 16.)  Due to complications with his illness, Mr. Pataki again stopped working in July 2002.  In August 2002 Mr. Pataki suffered a deep vein thrombosis in his lung and was hospitalized.  He continues to suffer from pulmonary emboli as a residual effect. (Id.)  By November 2002, Mr. Pataki had returned to work but limited his workday to four hours per day. (Id.)  After a required 180 day waiting period, in January 2003 Prudential approved Mr. Pataki's claim for partial Disability benefits because of his partial disability resulting from dermatomyositis and pulmonary embolus. (Id.)

In July 2003, Mr. Pataki's rheumatologist, Dr. Newman, approved an increase of thirty minutes in Mr. Pataki's four hour workday. (Id.)  In October 2003, Dr. Newman again approved an increase in Mr. Pataki's workday up to six hours per day.  In December 2003, Mr. Pataki's hours were reduced back to four per day because of reported fatigue, myalgia or muscle pain, and weakness in both arms and both legs. (Id.)  In December 2004, Mr. Pataki was diagnosed with diabetes mellitus, which contributed to his continuing muscle weakness. (Id.)  Prudential continued Mr. Pataki's partial disability benefits during this period.

At Prudential's suggestion, Dr. Newman performed a functional capacity review of Mr. Pataki on June 29, 2005.  Dr. Newman indicated that during a typical workday, assuming he could

change positions as needed, Mr. Pataki could sit for four hours, stand for two hours, and walk for one hour. (D.I. 14, A1.) Prudential's internal Medical Director, Dr. Kowalski, reviewed Dr. Newman's evaluation along with Mr. Pataki's CPK levels, which are enzymes that indicate muscle inflammation, and concluded in September 2005 that "If CPKs remain at an inconsistent/elevated level, restriction of part time work will continue to be warranted." (Id., A26.)  Mr. Pataki's CPK levels averaged approximately twice the normal level. (Id.)  At that time, however, Prudential decided to retain an investigator to document Mr. Pataki's functional level.

    I.   <u>Surveillance</u>

During the course of three days in October and November 2005, Prudential placed Mr. Pataki under live and video surveillance.  (D.I. 16, PRU 406-12, 421-24.)  The investigator's October report stated that Mr. Pataki attends the local YMCA approximately twenty-five times per month and that they were able "to confirm that claimant is a member of the YMCA soccer team, which practices three times per week in the evening hours." (Id., 421.)  During both days of November surveillance, Mr. Pataki attended the YMCA for approximately one hour in the morning. (Id., 406-12.)  During day one, Mr. Pataki attended a yoga class at the YMCA, ran some errands, and then returned home before working four hours in the afternoon.  (Id.)  During day two,

3

investigators videotaped Mr. Pataki at the YMCA using an elliptical machine for about thirty minutes, doing upper body weight exercises, and then shopping for groceries for approximately thirty minutes. (Id.)

Mr. Pataki disputes the allegation that he is a member of a soccer team and the reported frequency with which he visits the YMCA. A letter from a YMCA program director states that Mr. Pataki has two children involved in a soccer program and that "[i]n no way does Mr. Pataki, himself, play or coach soccer" at the YMCA. (D.I. 14, A20.) A "Facility Access Report" printout from the YMCA indicates that Mr. Pataki used the YMCA 284 times between January 2004 and May 2006, an average of ten times per month. (Id., A21.)

Dr. Kowalski, Prudential's internal medical director, conducted a review of Mr. Pataki's medical records and the surveillance report and video on January 18, 2006 and concluded "with a high degree of medical certainty [that] the claimant is capable of performing a sedentary occupation on a full time basis after 11/21/05." (D.I. 16, 117-18.) Dr. Kowalski opined that Mr. Pataki's elevated CPK levels "do not appear to correlate" with his symptoms, physical findings, and sedimentation rate, and noted that following a November 2005 office visit, Dr. Newman stated Mr. Pataki "is doing well symptomatically, functionally and objectively at present." (Id.) At that visit, Mr. Pataki had

"very little complaint of myalgia or arthalgia." (Id.) Dr. Kowalski's report continued:

> Therefore, I must conclude that the variations in the CPK is not a good indicator for the severity of the claimant's dermatomyositis. One possible explanation for this is the claimant's exercise program and participation on the YMCA Soccer team. One would expect elevation in the CPK secondary to the claimant's exercise program and relation to him having the test performed.

(Id.) Dr. Kowalski also opined that Mr. Pataki's 2005 medical records, based on "subjective complaints, physical examinations and laboratory findings[,] do not support impairment from his dermatomyositis" sufficient to prevent full time work. (Id.) Dr. Kowalski stated that Mr. Pataki, at his November 2005 visit with Dr. Newman, did complain of lack of endurance and mid-afternoon fatigue, but noted that the surveillance video showing a "strenuous exercise regiment over a 45 minute period ... strongly supports the claimant's ability to perform a sedentary occupation on a full time basis." (Id.) Lastly, Dr. Kowalski opined that there is no indication that Mr. Pataki's diagnoses of deep vein thrombophlebitis, pulmonary embolus, diabetes, and depression, "resulted in significant impairment in 2005." (Id.)

    II.   <u>Benefit Termination</u>

On January 25, 2006, Prudential terminated Mr. Pataki's partial disability benefits, on the basis that he is no longer "disabled" as defined by the policy at issue. (D.I. 14.) On February 1, 2006, Mr. Pataki appealed Prudential's decision to

terminate and on March 13, 2006, he submitted a letter of appeal outlining his health history and requesting, *inter alia*, that he be allowed to gradually increase his work hours.[1] (D.I. 16.) Mr. Pataki also submitted a letter dated April 10, 2006 from Dr. Newman, which stated:

> Mr. Pataki has been my patient since the onset of his inflammatory myopathy. This illness has been generally well controlled in recent years, with occasional flares, although there is probably continual low grade activity reflected by continual mild elevation of the CPK despite continuous prednisone therapy... Another component of his illness has been lack of endurance and chronic fatigue which has prevented him from working a normal 40 hour week. Periodic investigation of this complaint has revealed very mild hypothyroidism, a complication of autoimmune inflammatory myopathy. This may contribute to the chronic fatigue and he is being given low dose thyroid replacement. However, I feel the inflammatory myopathy itself can account for the fatigue, which I feel is real and a barrier to Mr. Pataki's ability to work full time. This is certainly within reasonable medical probability.

(D.I. 14, A4.)

On June 5, 2006, Prudential obtained an independent peer review of Mr. Pataki's file from a board-certified rheumatologist, Dr. Paul F. Howard. After reviewing, *inter alia*, Mr. Pataki's medical records from Dr. Newman, Dr. Kowalski's

---

[1] "The fact that your panel believes that I should immediately return to working normal eight-hour workdays after having worked four-hour days for the past 42 months defies sound medical reasoning. If after re-evaluating my case, for some reason you do conclude that I should return to my full-time status, I ask that you take the logical step of allowing that to happen gradually over time and under strict medical supervision." (D.I. 16, PRU 272.)

6

medical opinions, and the surveillance reports, Dr. Howard concluded that "Mr. Pataki's complaints of fatigue ... cannot be linked nor a result of dermatomyositis [sic] as there is evidence that it has been only under good control during the time period in question." (D.I. 16, PRU 252-259.)  Dr. Howard further opined that the variations in Mr. Pataki's CPK levels "did not correlate with his clinical symptoms," citing Dr. Newman's August 2005 statement that Mr. Pataki was "fairly asymptomatic from [the dermatomyositis]" and November 2005 statement that he was doing well "symptomatically, functionally, and objectively." (Id.)

On July 5, 2006, based on a review of the record and Dr. Howard's opinion, Prudential upheld its decision to terminate Mr. Pataki's partial disability benefits. (D.I. 16.)

### DISCUSSION

I.   Summary Judgment Standard

In pertinent part, Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all

inferences in the light most favorable to the non-moving party.

However, a court should not make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). To properly consider all of the evidence without making credibility determinations or weighing the evidence, a "court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. at 151 (internal citations omitted).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. . . . In the language of the Rule, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)(internal citations omitted). However, the mere existence of some evidence in support of the non-movant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Thus, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. Id.

8

II. <u>ERISA Standard of Review</u>

Claim denials and benefit terminations in ERISA cases are reviewed under the arbitrary and capricious standard if, as here, "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). "Under the arbitrary and capricious standard, an administrator's decision will only be overturned if it is without reason, unsupported by substantial evidence or erroneous as a matter of law [and] the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." <u>Pinto v. Reliance Standard Life Ins. Co.</u>, 214 F.3d 377, 387 (3d Cir. 2000) (internal quotation marks omitted).

In <u>Pinto</u>, the Third Circuit held that where an insurance company is both the plan administrator and funder, a court must take into account the structural conflict of interest present and apply a higher standard of review. <u>Id</u>. at 387-90. The <u>Pinto</u> court adopted a "sliding scale" approach to "heightened" arbitrary and capricious review, by which a court should "approximately calibrat[e] the intensity of [its] review to the intensity of the conflict." <u>Id</u>. at 393. "At its best, the sliding scale reduces to making a common-sense decision based on the evidence whether the administrator appropriately exercised

9

its discretion." Post v. Hartford Ins. Co., 154 F.3d 154, 162 (3d. Cir. 2007).

Application of this heightened, sliding scale arbitrary and capricious review requires considering both structural and procedural factors. Id.; Pinto, 214 F.3d at 392-93. Factors such as the relative sophistication of the parties and the information accessible to the beneficiary are relevant to the structural inquiry, Pinto, 214 F.3d at 392, but a court's focus should be on whether an "administrator has strong financial incentives routinely to deny claims in close cases," and this is "anything but a mechanistic test," Post, 154 F.3d at 163. Where an outside insurance company both administers the plan and funds benefits, it has an obvious incentive to construe claims in the light most favorable to it, and this structural conflict alone gives rise to heightened scrutiny. Pinto, 214 F.3d at 389-90. Structural conflict alone, in the absence of evidence that bias infected the particular decision at issue, warrants only a moderately heightened review, whereby "we defer to an administrator's reasonable and carefully considered conclusions." Post, 154 F.3d at 164 (citations omitted).

The second step of sliding scale review requires examination of the process by which the administrator came to its decision to determine whether there is evidence of bias. Id. A non-exhaustive list of procedure irregularities identified by courts

includes: "(1) reversal of position without additional medical evidence, Pinto, 214 F.3d at 393; (2) self-serving selectivity in the use and interpretation of physicians' reports, id.; (3) disregarding staff recommendations that benefits be awarded, id. at 394; and (4) requesting a medical examination when all of the evidence indicates disability, Kosiba v. Merck & Co., 384 F.3d 58, 67 (3d Cir. 2004)." Post, 154 F.3d at 164-65. "In considering procedural factors, the focus is whether, in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality." Id. at 165. Irregularities that are minor, or few in number, may not warrant raising the level of review much at all, whereas those that are more serious, numerous, or regular "should raise more suspicion." Id. (citations omitted).

    III. Analysis

    By his motion, Mr. Pataki contends that Prudential's decision was arbitrary and capricious because (1) it was based on factually inaccurate investigative reports, and (2) it conflicted with the medical opinion of Mr. Pataki's treating physician, Dr. Newman. Addressing the second contention first, Prudential was under no obligation to defer to the opinion of Mr. Pataki's treating physician. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003)("[C]ourts have no warrant to require administrators automatically to accord special weight to the

opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.") Rather than "arbitrarily refusing to credit" Dr. Newman's opinion, Black & Decker, 538 U.S. at 834, Prudential repeatedly referenced his findings in making its determinations and had an objective basis for not adopting his conclusion.[2] That Prudential ultimately relied more heavily on the medical opinions of Drs. Kowalski and Howard, rather than Dr. Newman, does not, as a matter of law, render its decision unreasonable or inadequately considered.

    Mr. Pataki's contention that Prudential's decision was unsupported by substantial evidence, because of its reliance on the false factual premise that he participated in a soccer league, presents a closer question. Had Dr. Kowalski relied heavily on the investigative report regarding Mr. Pataki's involvement in soccer, his medical conclusion would have been tainted and less reliable. The record reveals, however, that Dr. Kowalski considered a wide range of factors in his determination, including Mr. Pataki's spiked CPK levels at times when Dr. Newman stated he was doing well symptomatically. Dr. Kowalski's conclusion that the CPK levels do not appear to correlate with

---

    [2]Prudential considered Mr. Pataki's verified exercise regime and the discrepancies between his CPK levels and reported well-being.

his symptoms, physical findings, and sedimentation rate is not patently unreasonable, as demonstrated by Dr. Howard's concurring report. Moreover, the video surveillance of Mr. Pataki exercising at the YMCA for approximately 45 minutes, before running errands and later working four hours in the afternoon, is uncontroverted.[3] The evidentiary record, apart from the factual inaccuracies regarding soccer league participation, is sufficient to support Prudential's reliance on Dr. Kowalski's and Dr. Howard's opinions. Thus, the Court concludes that Prudential properly exercised its discretion in terminating Mr. Pataki's disability benefits.

## CONCLUSION

For the reasons discussed, the Court concludes that Mr. Pataki has not established that Prudential acted arbitrarily and capriciously when it terminated Mr. Pataki's long-term disability benefits. Accordingly, the Court will grant the Defendants' Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

An appropriate order will be entered.

---

[3] The Court finds the dispute over the frequency with which Mr. Pataki attended the YMCA irrelevant. Mr. Pataki concedes that he exercises daily (and contends that his condition requires such exercise). (D.I. 16, PRU 271.)

13